**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MONROE WEEKLEY, III, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 21-660 |
| | ) | |
| v. | ) | District Judge J. Nicholas Ranjan |
| | ) | Magistrate Judge Maureen P. Kelly |
| MICHAEL CLARK, *Superintendent, SCI* | ) | |
| *Albion*; and | ) | Re:  ECF Nos. 127 and 128 |
| ATTORNEY GENERAL OF | ) | |
| PENNSYLVANIA, *and* DISTRICT | ) | |
| ATTORNEY OF BEAVER COUNTY | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM ORDER

Monroe Weekley, III ("Petitioner") is a state prisoner currently incarcerated at the at the State Correctional Institution at Albion ("SCI-Albion") in Albion, Pennsylvania.  Petitioner initiated this action by submitting a Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Initial Petition"), which was received by this Court on May 18, 2021.[1]  ECF No. 1.  On February 22, 2022, Petitioner timely submitted an Amended Petition, which attacks his criminal conviction in the Court of Common Pleas of Beaver County, Pennsylvania, at Docket No. CP-04-CR-2162-2011.  ECF No. 85 at 1.

Currently before this Court are Petitioner's "Question for the Court," ECF No. 127, and his "Comprehensive Motion for Discovery," ECF No. 128.  In both filings, Petitioner seeks an

---

[1] The Initial Petition is dated May 7, 2021.  ECF No. 1 at 15.  This Court presumes that this is the date on which Petitioner placed the Initial Petition in the prison mail system.  Accordingly, this federal habeas action is deemed filed on May 7, 2021 pursuant to the prisoner mailbox rule. Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998).

1

order directing Respondents to produce various items of discovery. These motions are opposed by Respondents. ECF No. 130. Petitioner has replied. ECF No. 135.

For the reasons stated herein, Petitioner has not met his burden to show good cause for the requested discovery, and his motions will be denied.

## I.   FACTUAL HISTORY AND PROCEDURAL BACKGROUND

Petitioner seeks federal habeas relief from his 2012 conviction in the Court of Common Pleas of Beaver County, Pennsylvania for criminal homicide in violation of 18 Pa. C.S.A. § 2501(a), receiving stolen property in violation of 18 Pa. C.S.A. § 3925, and possession of firearms not to be carried without a license in violation of 18 Pa. C.S.A. § 6106(a)(1).[2] ECF No. 85 at 1. See also Docket, Com. v. Weekley, No. CP-04-CR-2162-2011 (available at https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-04-CR-0002162-2011&dnh=bLjKCyWsNMrIjdFEUWhkOg%3D%3D (last visited Mar. 31, 2023)).

The following is a recitation of the facts by the trial court in its opinion relative to Petitioner's second direct appeal, and which was adopted by the Pennsylvania Superior Court.

> A. Facts and Investigation
>
> This matter arises out of the death of Rashawn T. Cameron. At approximately 11:35 a.m. on Sunday, November 21, 2010, the Beaver County 911 Emergency Control Center received a telephone call from an unidentified female located at the residence of Willie Martin at 308 Cooper Street, Aliquippa, Pennsylvania. The female reported that, inside the residence, an unknown male was lying on the living room couch unresponsive and bleeding from the face. As a result of the caller's information, the Emergency Control Center dispatched Aliquippa Police to the reported address. Upon arrival at the residence at approximately 11:40 a.m., the responding officers observed a black male

---

[2] While not stated explicitly on the docket, the grading of Petitioner's conviction for criminal homicide was third degree murder. See Sentencing Order, ECF No. 41-12 at 5; see also 18 Pa. C.S.A. §§ 2501 and 2502(c).

identified as Rashawn T. Cameron (hereinafter, "Cameron") lying in a pool of blood. His waist was positioned at the edge of a seat cushion with his feet resting on the floor. A preliminary examination of Cameron's body by the responding officers and Deputy Coroner Wayne Tatalovich revealed that Cameron sustained a gunshot wound to the back of his head behind his left ear with a large exit wound on his forehead above the right eye. He was pronounced dead at the scene. During the search of the crime scene, law enforcement located fragments of a lead projectile. After performing an autopsy. Dr. James Smith determined that Cameron died as a result of the gunshot wound and that Cameron was the victim of a homicide.

On February 10, 2011, Assistant Chief County Detective Andrew Gall and County Detective Robert Heberle interviewed Bradley J. Karas (hereinafter, "Karas") in connection with their investigation of this matter. Karas told the officers that during the morning of November 21, 2010, he was sleeping at the residence of James C. Stewart III (hereinafter, "Stewart") at 181 Baker Street. Aliquippa, Pennsylvania. According to Karas. Defendant arrived at Stewart's residence between 6:30 a.m. and 7:30 a.m. wearing dark jeans, black boots, a black hoodie, and carrying a black book bag. Karas stated that, after seeing Defendant, he fell asleep again and awoke at approximately 10:30 a.m. Shortly thereafter, Karas walked into the kitchen and observed Defendant and Stewart talking. Karas stated that he also observed Defendant remove what appeared to be a .44 caliber Smith and Wesson revolver handgun from his black book bag. Defendant then asked Karas to take the handgun downstairs to clean it and warned that the handgun should not be touched until after it was cleaned. Karas stated that, after he complied with Defendant's request, Defendant and Stewart left Stewart's residence and attempted to sell the handgun to James E. Connor III (hereinafter, "Connor").

Karas told Detectives Gall and Heberle that, upon returning to Stewart's residence. Defendant described the murder of Cameron. Defendant told Karas that he and an unidentified black male purchased a $50.00 piece of crack cocaine from an unidentified individual at a crack house on Plan 11 in Aliquippa. Defendant, the unidentified black male, and someone Defendant referred to as the "Vic" went outside of the crack house for about a minute and then the "Vic" and Defendant went back inside the crack house. Defendant stated that, when the "Vic" sat on the couch and bent over to retrieve something from under the coffee table, Defendant shot the "Vic" in the head. Defendant stated that he attempted to rob the "Vic" but found nothing in his pockets. Defendant then

3

walked to Valley Terrace, left his clothes near a dumpster, and proceeded to Stewart's residence.

After he related these events, Defendant remained at Stewart's residence until approximately 4:00 p.m., when an unidentified white female driving a white Chevrolet Cavalier picked Defendant up and drove him from the residence. Karas told the detectives that, as Defendant left, he was carrying the same black book bag that had previously held the revolver.

Also on February 10, 2011, Detective Heberle and Sergeant Steve Roberts of the Aliquippa Police Department reported to Connor's residence at 171 Baker Street, Aliquippa, Pennsylvania to question Connor and to attempt to retrieve the .44 caliber revolver that Stewart allegedly sold to Connor on behalf of Defendant. Connor admitted that he purchased a .44 Magnum Ruger Redhawk revolver (hereinafter, "Redhawk revolver") from Stewart, and, based on information provided by Connor, the investigators were able to recover the Redhawk revolver. Through an inquiry conducted at the Beaver County Emergency Control Center, law enforcement officials discovered the identity of the owner of the Redhawk revolver and that it was reported missing by the owner in May of 2010.

On February 11, 2011, Connor reported to the police station and provided a statement regarding how he acquired the Redhawk revolver. Connor indicated that, at some point towards the end of November 2010, Stewart came to his residence and sold him the Redhawk revolver for $400.00, Stewart told Connor that he would be unable to transfer ownership of the firearm until he located the previous owner.

Later that day, Sergeant Roberts, Detective Heberle, and Captain Anthony Q. McClure interviewed Stewart at the Aliquippa Police Department. Stewart told the officers that, on the morning of November 21, 2010, he awoke to find Defendant in his residence. According to Stewart, Defendant stated that he had done something bad and proceeded to tell Stewart about the murder of Cameron. Defendant stated that he regretted bringing Cameron to Stewart's residence to purchase a gun because Cameron was working with the police and Cameron owed him $600.00. Defendant also stated that, at approximately 3:00 a.m. earlier that morning, Defendant went to Willie Martin's residence to get his money from Cameron and caught Cameron doing something "foul" as he entered the house. Defendant stated that he then aimed his gun at Cameron and demanded his money. According to

4

Defendant, Cameron reached for his gun and a fight over Defendant's gun ensued. Defendant stated that he ultimately struck. Cameron with his gun and then shot him.

Stewart told the officers that following this conversation, Defendant asked Karas to clean his gun, and Karas complied. After cleaning the gun, Karas wrapped it in a black t-shirt and placed it in Defendant's black book bag. Stewart indicated that Defendant offered to sell the gun to him but Stewart declined and suggested selling it to Connor. Defendant agreed, and Stewart went to Connor's residence to arrange the deal. Stewart stated that he gave Connor's money to Defendant and that Defendant handed Stewart the black book bag containing the gun. Stewart then gave the gun to Connor and returned the black book bag to Defendant.

On February 17, 2011, Detective Heberle, Captain McClure, and Detective Tim Staub interviewed Roger L. Henderson, Jr. (hereinafter, "Henderson") regarding a statement Stewart made to him. Henderson indicated that on December 29, 2010, he met with Stewart to exchange handguns. According to Henderson, Stewart stated that Defendant had previously given him a bloody handgun that was used in the shooting death of Cameron.

On February 18, 2011, Sergeant Donald Couch of the Aliquippa Police Department submitted the Redhawk revolver and the mutilated bullet fragment seized from the crime scene to the Pennsylvania State Police Greensburg Regional Crime Laboratory. On February 24, 2011, the forensic scientist from the serology department at the Greensburg Laboratory notified Sergeant Roberts that the firearm tested positive for the presence of blood and that there would be future tests comparing the blood from the firearm with the blood samples obtained from Cameron. The forensic examination also revealed that the mutilated bullet fragment recovered from the crime scene was discharged from the Redhawk revolver.

On February 28, 2011, Captain McClure submitted an application for a search warrant requesting that he be permitted to take the following actions: report to the Community College of Beaver County, where Defendant was a student, and seize the black book bag Defendant may be carrying and the black boots and black hoodie he may be wearing; transport Defendant to the Heritage Valley Medical Center so that two purple top tubes of blood may be extracted from him; search Defendant's residence at 717 Washington Street, Aliquippa, Pennsylvania as well as the curtilage for any black book bags, .44 caliber ammunition, black

boots, black hoodie, indicia of residence, and any other items believed to be associated with the shooting death of Cameron; and search any vehicles that are possessed by Defendant. In support of his request, Captain McClure's application included the information listed above that was gathered from the witness interviews and initial investigation. At 8:40 a.m. on February 28, 2011, the Honorable Judge John P. Dohanich signed and authorized Captain's McClure's search warrant application.

After securing the search warrant, Captain McClure and other detectives proceeded to the Community College of Beaver County to execute the search warrant. Upon arriving at Defendant's class the detectives and campus security asked the instructor to have Defendant exit the classroom, Defendant stepped into the hallway, and the detectives put him in handcuffs. He was subsequently searched for weapons, and a campus security officer took the black book bag he was carrying and gave it to the detectives. Defendant was then transported to the detectives' office. While at the office the detectives discovered that the search warrant (hereinafter, "unexecuted search warrant") they obtained earlier that day provided the wrong date of birth and wrong Pennsylvania Driver's License Number for Defendant. After realizing their mistake, the officers transported Defendant back to the Community College and returned his book bag to him.

Later that day, Captain McClure retyped the search warrant application and submitted it to Judge Dohanich who signed and authorized it at 3:20 p.m. Other than the corrected date of birth and driver's license number, the new search warrant contained the same information as the unexecuted search warrant. After obtaining the search warrant (hereinafter, "search warrant for Defendant's clothes, book bag, and blood"), the detectives proceeded to Defendant's residence at approximately 5:05 p.m, and searched the premises, seizing Defendant's black and plaid Dakine back pack from his living room as well as Defendant's Carhart black hooded jacket size 5X, black and yellow reversible hooded sweatshirt, and black Nike Reax size 13 shoes from his person. They subsequently transported Defendant to the Heritage Valley Medical Center to have Defendant's blood drawn ultimately obtaining two purple capped tubes of Defendant's blood.

At approximately 9:00 p.m. on March 1, 2011, Captain McClure again met with Stewart, who indicated that he received a call from Defendant on his cell phone earlier that evening. According to Stewart, Defendant related to Stewart how the police drew blood from him and seized his book bag and some of his clothing on

February 28, 2011. Defendant also indicated that he believed it was Karas, Alvin J. Flowers (hereinafter, "Flowers"), or a woman named Donzi Perry (hereinafter, "Perry") who were providing information about Cameron's murder to the police. Defendant explained that both Perry and Flowers had first-hand knowledge of the homicide because Perry was sitting outside of Willie Martin's home when it occurred and Flowers was performing oral sex on Cameron inside the house just before Defendant shot Cameron. Stewart told Captain McClure that at some point during his conversation with Defendant, Stewart suggested that they communicate by text message rather than talk on the phone. Defendant agreed, and the two sent several text messages to each other speculating about who was responsible for notifying law enforcement about the homicide. During the interview, Stewart permitted Captain McClure to review the text messages using Stewart's cell phone. Captain McClure reviewed the messages and identified (724) 406-2036 as Stewart's cell phone number and (724) 513-1579 as the number for the cell phone Defendant was using.

On March 3, 2011, Captain McClure sent preservation letters to Cricket Communications and Sprint / Nextel Communications to preserve the records from Stewart's and Defendant's cell phone numbers, respectively. Captain McClure requested that the subpoena compliance departments of the companies preserve these records for the period of February 28, 2011 to March 3, 2011. On March 12, 2011, the subpoena specialist for Sprint / Nextel Communications confirmed that the call detail records, subscriber information and customer account notes for the cell phone number (724) 513-1579 were being preserved. The subpoena specialist further indicated that a search warrant was required to release any content or stored communications.

On March 14, 2011, Captain McClure submitted two search warrant applications requesting the billing and account information, call detail records, and text messages for Stewart's and Defendant's cell phones. The applications contained information obtained from the March 1, 2011 interview of Stewart as well as the same information included in the application for the search warrant for Defendant's clothes, book bag, and blood. On March 14, 2011, this Court signed and authorized the search warrant for Stewart's cell phone records at 3:05 p.m. as well as the search warrant for Defendant's cell phone records (hereinafter, "first search warrant for Defendant's cell phone records") at 3:15 p.m. Based on a review of the record, no evidence was obtained as a result of these search warrants.

B. Criminal Proceedings

On July 18, 2011, Sergeant Roberts filed a Criminal Complaint against Defendant, charging him with criminal homicide (18 Pa.C.S.A. § 2501(a)), robbery (18 Pa.C.S.A. § 3701(a)(1)(i)), receiving stolen property (18 Pa.C.S.A. § 3925(a)), firearms not to be carried without a license (18 Pa.C.S.A. § 6106(a)(1)), and crimes committed with firearms (18 Pa.C.S.A. § 6103). On the same day a warrant was issued for Defendant's arrest, and Defendant was taken into custody. While incarcerated in the Beaver County Jail. Defendant's phone conversations were recorded. During these conversations, a message was broadcasted multiple times warning that the conversation was being recorded. On September 2, 2011, a subpoena duces tecum was issued for recorded telephone conversations involving Defendant from the date of his incarceration to September 1, 2011. Warden William Schouppe of the Beaver County Jail complied with the subpoena (hereinafter, "subpoena for jail recordings").

On November 15, 2011, a subpoena duces tecum was issued to Sprint / Nextel for the subscriber information, call detail records including text messages, and cell site tower location data for cell phone number (724) 513-1579 for the dates and times of November 19, 2010 at 12:00 p.m. to July 18, 2011 at 12:00 p.m. Sprint / Nextel did not provide any of the requested information except for a list of phone numbers and a letter stating that the requested data could not be supplied because the proper paperwork was not issued. As a result, on November 23, 2011, Detective Chamberlain submitted an application for search warrant requesting the same information for the period of November 19, 2010 at 12:00 p.m. to November 18, 2011 at 12:00 p.m. In the affidavit, Detective Chamberlain indicated that Stewart testified during the November 9, 2011 preliminary hearing regarding communications he had with Defendant. Stewart testified that he was receiving text messages from Defendant, who was using a cell phone with the number (724) 513-1579. Detective Chamberlain also indicated that he verified that this cell phone was active before, during, and after the investigation into Cameron's death. At approximately 1:12 p.m. on November 23.2011, Judge Dohanich signed and authorized the search warrant (hereinafter, "second search warrant for Defendant's cell phone records"). Sprint / Nextel provided the requested information on December 5, 2011.

On that same date, the Commonwealth filed an Information charging Defendant with criminal homicide, robbery, receiving

8

stolen property, and firearms not to be carried without a license. On May 21, 2012, Defendant filed an Omnibus Pre-Trial Application, which included several different motions. A hearing on Defendant's Application was held on June 1, 2012 and June 4, 2012. During the hearing, the Court denied Defendant's request for a bill of particulars, and in an Order filed on June 11, 2012, the Court addressed Defendant's discovery issues. On July 5, 2012, the Court issued an Order denying Defendant's Motion to Suppress Evidence.

Trial in this matter commenced on August 6, 2012. During the testimony of Stewart, the Commonwealth displayed to the jury a series of photographs of text messages exchanged between Defendant and Stewart on March 1, 2011, Defendant initially objected to the presentation and admission of the photographs, and the Court overruled Defendant's objection. On August 10, 2012, Defendant filed a Trial Motion for Suppression of Evidence and Mistrial, seeking to suppress the text message exchange and all evidence derived from the seizure of it. According to Defendant, Stewart testified that he sent text messages to Defendant at Captain McClure's direction in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (hereinafter, "Wiretap Act"). The Court held a hearing on Defendant's Trial Motion on August 14, 2012 and issued an Order on August 15, 2012 denying Defendant's Trial Motion. The trial concluded on August 20, 2012 with a jury verdict of guilty on the charges of third degree murder, firearms not to be carried without a license, and receiving stolen property and a jury verdict of not guilty on the charges of first and second degree murder and robbery.

On October 3, 2012, Defendant was sentenced to serve an aggregate term of 24 and one-half years to 52 years of incarceration and to pay an aggregate fine of $11,500.00. In addition Defendant was ordered to pay restitution in the amounts of $9,440.00 to the Pennsylvania State Police Laboratory for lab fees, $1,711.00 to Cameron's father for funeral expenses, and $6,500.00 to the Victims Compensation Fund for funeral expenses. On October 15, 2012, Defendant filed an Omnibus Post–Sentence Application containing a Motion in Arrest of Judgment, a Motion for a New Trial, and a Motion for Modification of Sentence. Following the transcription of the notes of testimony. Defendant filed a Supplemental Omnibus Post–Sentence Application on January 2, 2012. Oral argument on Defendant's post-sentence motions was held on February 4, 2013. On February 8, 2013. the Court issued an Order denying Defendant's post-sentence motions.

9

ECF No. 41-14 at 1-10. <u>See also</u> <u>Com. v. Weekley</u>, No. 1732 WDA 2014, 2015 WL 6956530, at

*1 and 3-9 (Pa. Super. Ct. July 10, 2015).

The Pennsylvania Superior Court added the following recitation of the factual and

procedural history in connection with Petitioner's second set of proceedings initiated pursuant to

the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. §§ 9541-9546:

> The evidence at trial showed that the victim died as a result of being shot in the back of the head with a large caliber weapon. The deceased victim was found by investigators slumped over a couch with his pants pulled down around his knees. [Petitioner] went to the home of James Stewart and knocked on the door. Brad Karas, who was inside, let [Petitioner] in, told him that Stewart was asleep, and that he could wait until Stewart woke up. When Stewart eventually came downstairs and woke Karas back up, [Petitioner] spoke to Stewart, admitting that he had shot and killed the victim after a struggle, and that the victim had been doing something "foul" when he entered the room. Stewart testified that [Petitioner] told him that "he caught [the victim] sitting on a chair in the house receiving fellatio from [Alvin] Jay Flowers." Stewart testified that [Petitioner] told him that the victim and [Petitioner] had previously "pulled a lick," meaning they had committed a robbery together, that the victim had taken the $1,200 proceeds from the robbery, and that the victim had failed to provide [Petitioner] his $600 share of the proceeds. Karas testified that [Petitioner] told him he had killed the victim over drugs.
>
> While [Petitioner] and Stewart were talking, Karas was instructed to clean [Petitioner's] .44 Magnum Redhawk revolver, which he did. Stewart then took the revolver, left the home with [Petitioner], and walked to the residence of James Connor, who lived nearby. Stewart sold the firearm to Connor, and gave the proceeds of the sale to [Petitioner].
>
> Stewart later began to cooperate with investigators. A series of phone calls and text messages were made between Stewart's cell phone and [Petitioner's]. The incriminating communications from [Petitioner] indicated, among other things, that [Petitioner] thought that Karas could not be trusted to keep from talking to the police, that [Petitioner] did not think Karas would be believed by anyone because he was a drug addict, and that "two womens [sic] word is better than one he [sic] just a [friend]." [Petitioner] stated to Stewart over the phone, "No gun no case."

During the investigation, the firearm, which had been left by Connor at his son's residence, was recovered. A bullet and copper jacket were also recovered from the crime scene in a location consistent with the trajectory of the head wound suffered by the victim. Forensic testing confirmed that the bullet found at the scene was fired by the Redhawk revolver.

The jury returned a verdict on August 20, 2012, finding [Petitioner] guilty of the third degree murder of the victim. The jury also found [Petitioner] guilty of receiving stolen property and carrying a concealed firearm without a license. On October 3, 2012, [Petitioner] was sentenced to serve an aggregate period of incarceration of 24½ years to 52 years. The conviction and sentence were affirmed by the Superior Court [on direct appeal on July 10, 2015]. Com[.] v. Weekley, 125 A.3d 447[, 2015 WL 6956530,] (Pa. Super. [Ct.] 2015) (unpublished memorandum). The Superior Court affirmed [Petitioner's] judgment of sentence on the trial court's opinion. [Petitioner] filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which denied *allocatur* on December 31, 2015.

Second PCRA Super. Ct. Op., Com. v. Weekley, 240 A.3d 196 (Table), No. 812 WDA 2019, 2020 WL 5015898, at *1-2 (Pa. Super. Ct. Aug. 25, 2020) (footnote and some internal brackets removed).

Petitioner filed a first PCRA petition in order to reinstate his direct appeal rights after his first direct appeal had been dismissed by the Superior Court due to Petitioner's counsel's failure to file a timely opening brief at Docket No. 424 WDA 2013. ECF Nos. 41-8 and 41-10. This relief was granted by the first PCRA trial court on September 19, 2014. ECF No. 41-11 at 1-2. The second direct appeal followed.

On his second direct appeal, Petitioner raised the following issues with the Superior Court.

I. The [t]rial [c]ourt erred in determining that the evidence was sufficient to support a conviction for [r]eceiving [s]tolen [p]roperty, where the Commonwealth failed to offer any evidence that [Appellant] knew the firearm was stolen.

11

> II. The [t]rial [c]ourt abused its discretion in imposing consecutive sentences, using an incorrect offense gravity score of 9 (loaded weapon) rather than 7, which resulted in an unduly harsh sentence, without considering [Appellant's] specific circumstances and rehabilitative needs when compared to the need to protect the public.

Super. Ct. Second Direct Appeal Op., Com. v. Weekley, No. 1732 WDA 2014, 2015 WL 6956530, at *1 (Pa. Super. Ct. July 10, 2015).   The Superior Court affirmed Petitioner's judgment of sentence. Id. at *3.  See also Concise Statement of Issues on Appeal, ECF No. 41-13 at 1.

Petitioner timely sought leave to appeal his conviction to the Pennsylvania Supreme Court at Docket No. 326 WAL 2015.   That court denied *allocatur* on December 31, 2015. ECF No. 41-15.    The    docket    for    326    WAL    2015    is    available    at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=326%20WAL%202015&dnh=xcJn35%2Be%2FKjCQ6DbOwqj3g%3D%3D) (last visited Mar. 31, 2023).

There is no indication on the record that Petitioner filed a petition for writ of *certiorari* with the United States Supreme Court with respect to his direct appeal.  As such, his conviction became final on March 30, 2016 – 90 days after *allocatur* was denied.  See U.S. Sup. Ct. R. 13; see also Jenkins v. Sup't of Laurel Highlands, 705 F.3d 80, 84 (3d Cir. 2013) ("On direct review, the Pennsylvania Supreme Court denied Jenkins's petition for allowance of appeal on September 28, 2007 . . . .  Because Jenkins had ninety days to petition for certiorari to the United States Supreme Court, his conviction became final on December 27, 2007.").

The procedural history of underlying Petitioner's attempt for state court post conviction remedies continues as follows:

> On October 5, 2016, [Petitioner] filed a [second] motion for post conviction collateral relief.  [ECF No. 41-17.]  [Petitioner] was

12

appointed counsel, who, after several extensions, filed an amended PCRA petition on June 19, 2017. [ECF No. 41-19 at 14.] The PCRA court held an evidentiary hearing on the petition on June 8, 2018, and continued the hearing to August 1, 2018 in order to allow the parties an opportunity to locate and test evidence that was collected during the initial investigation of this case. [Petitioner] was present for each day of the evidentiary hearing, and was represented by counsel. Counsel for the Commonwealth and the charging officer were also present. On August 1, 2018, the PCRA court entered an order scheduling briefs and oral argument, which was held on December 13, 2018.

Second PCRA Super. Ct. Op., 2020 WL 5015898, at *2 (internal brackets removed). The

Second PCRA petition was denied by the trial court on April 29, 2019. ECF No. 41-26 at 1.

Petitioner timely filed an appeal to the Superior Court. ECF No. 41-27 at 1. The

Superior Court addressed Petitioner's claims of ineffective assistance of counsel on four bases.

1. Whether prior trial counsel was ineffective when prior trial counsel failed to highlight the lack of forensic testing of the vehicle swabs?

2. Whether the Commonwealth inadvertently withheld potentially exculpatory evidence and whether prior trial counsel was ineffective when prior trial counsel failed to highlight the lack of forensic testing of the clothing worn by the initial suspect in the case?

3. Whether prior trial counsel was ineffective for failing to fully and adequately cross-examine witnesses with impeachment evidence?

4. Whether there was actual prejudice to [Petitioner] when prior trial counsel failed to adequately present exculpatory information to the jury and adequately cross-examine key witnesses?

Second PCRA Super. Ct. Op., 2020 WL 5015898, at *2.

With respect to the second issue on appeal, the specific evidence at issue was "the

clothing found at Sheldon Sims' residence." Id. at *5. With respect to the third issue, the

witnesses were James Stewart and Bradley Karas, and the impeachment evidence at issue was

telephone records indicating that Petitioner called Stewart's landline from his cellular phone. Id.

at *6.  See also Petitioner Amended PCRA Br. filed Oct. 15, 2018, ECF No. 41-24 at 8-10.  The fourth issue was interpreted by the Superior Court to attack the cumulative effect of the above alleged errors by trial counsel.  Second PCRA Super. Ct. Op., 2020 WL 5015898, at *6-7.  On August 25, 2020, the Superior Court denied all four of these claims on the merits and affirmed the decision of the Second PCRA trial court.  Id. at *7.

Petitioner timely sought allowance to appeal from the Pennsylvania Supreme Court on September 17, 2020, which was denied on February 22, 2021.  Com. v. Weekley, 249 A.3d 495 (Pa.  2021)  (Table).   See also  Docket,  No.  285  WAL  2020  (available  at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=285%20WAL%202020&d nh=HZfzwTz3IOrjxgGYt9MKpg%3D%3D (last visited Mar. 31, 2023)).

On September 14, 2021, Petitioner filed a motion for DNA testing with the Court of Common Pleas of Beaver County.  See Docket, Com. v. Weekley, No. CP-04-CR-2162-2011 (available  at  https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-04-CR-0002162-2011&dnh=bLjKCyWsNMrIjdFEUWhkOg%3D%3D (last  visited  Mar.  31,  2023)). After the issue was briefed, the trial court denied relief on January 4, 2022.  Id.  That court held that it had jurisdiction to hear Petitioner's motion, but that he did not meet the requirements of the applicable Pennsylvania statute.  See Mem. Op. and Rule 907 Notice, dated Dec. 10, 2011.

## II.  HABEAS PETITION

Petitioner initiated this federal habeas action on May 7, 2021 with the filing of the initial Petition.  He filed the Amended Petition on February 22, 2022.  ECF No. 85.  Respondents

answered the Amended Petition on April 20, 2022.  ECF No. 109.[3]  Petitioner timely filed a

Traverse to Respondents' Answer on June 10, 2022.  ECF Nos. 123, 124, and 125.

In the pending Amended Petition, Petitioner asserts the following grounds for relief.

Ground One:   The Commonwealth withheld evidence and prior counsel was ineffective for failing to raise the claim (Clothes found at Sheldon Sims' residence).  ECF No. 85 at 6.

Ground Two:   Prior trial counsel was ineffective for failing to argue and present to the jury, the information concerning the lack of forensic testing on the swabs recovered from the vehicle [of Tamika Brown].  The P.C.R.A. Court's findings are not supported by the record.  Id. at 8.

Ground Three: Prior trial counsel was ineffective for failing to adequately cross examine important witnesses [James Stewart and Bradley Karas] with impeachment evidence.  The P.C.R.A. Court's findings are not supported by the record.  Id. at 9.

Ground Four:   The P.C.R.A. Court erred in finding no actual prejudice to the [Petitioner] when prior trial counsel failed to adequately present exculpatory evidence, cross examine key witnesses, and indecently investigate or petition the court to test blood and DNA evidence.  Id. at 11.

In their Answer, Respondents assert that Ground Four essentially is incorporated into the

analyses of Grounds One through Three.  ECF No. 121 at 3 n.1.  Respondents concede that these

claims are timely under the applicable statute of limitations and exhausted.  Id. at 3-5.

In the Amended Petition, Petitioner also raises so-called "additional grounds," which are

difficult to follow.  As best this Court can discern, these "additional grounds" are as follows.

(a) The trial court erred in refusing to suppress various evidence. ECF No. 85 at 17-18, 22-23.

---

[3] The Answer was more than one month late, and a show cause order was necessitated to compel Respondents to file it.  ECF No. 98.  Also, the Court was required to issue multiple orders to compel Respondents to submit a complete copy of the record of Petitioner's underlying state court proceedings to this Court.  ECF No. 96.

(b) The trial court erred in limiting examination of various witnesses and in allowing or limiting the admission of various evidence during trial. <u>Id.</u> at 17-19, 25-26.

(c) The trial court erred in refusing to issue certain jury instructions requested by Petitioner. <u>Id.</u> at 19-20.

(d) Petitioner was held in isolation during pretrial detention, which adversely affected his ability to effectively testify at trial. <u>Id.</u> at 20.[4]

(e) Petitioner's sentence was improperly calculated. <u>Id.</u> at 20.

(f) Petitioner's trial and appellate counsel were ineffective for failing to investigate various individuals, some of whom were fabricated by authorities. <u>Id.</u> at 21.

(g) Petitioner's trial and appellate counsel were ineffective for failing investigate potential exculpatory evidence. <u>Id.</u>

(h) The trial judge showed animosity toward Petitioner during trial in front of the jury. <u>Id.</u> at 22, 26-28.

(i) The trial court erred when it did not grant a mistrial, and permitted the admission of a search warrant and various inculpatory text messages. <u>Id.</u> at 23-24.

(j) The prosecution committed misconduct by prosecuting Petitioner despite alleged evidence supporting the conclusion that another individual – Alvin "Jay" Flowers – had committed the crime. <u>Id.</u> at 29.[5]

---

[4] This likely refers to Petitioner's claims in <u>Weekley v. Shouppe</u>, No. 11-1625, in the U.S. District Court for the Western District of Pennsylvania. ECF No. 85 at 13. In that lawsuit, he asserted that his pretrial detention in solitary confinement prevented him from having a fair trial in the state criminal case underlying the instant federal habeas proceeding. <u>Id.</u>

[5] In their Answer, Respondents group the "additional grounds" into the following categories:

> (1) the trial judge exhibited personal animosity toward Weekley;
> (2) objections raised by Weekley's trial counsel were overruled;
> (3) Weekley's motion for a mistrial was denied; (4) the trial court permitted the introduction of a search warrant and displays of text messages where Weekley admitted to his crime; (5) the trial court exhibited bias toward Weekley; and (6) prosecutorial misconduct

(continued . . . .)

Respondents answered the Amended Petition on May 10, 2022.  ECF No. 121.  Petitioner submitted a Traverse on June 10, 2022.  ECF Nos. 123 and 124.

On July 13, 2022, Petitioner submitted the two pending discovery motions.  ECF Nos. 127 and 128.  Respondents filed their response in opposition.  ECF No. 130.  Petitioner filed a reply on September 16, 2022.  ECF No. 135.

The pending discovery motions are ripe for consideration.

## III.   THE DISCOVERY MOTIONS

In the two pending discovery motions, Petitioner seeks the following discovery.

- DNA testing of any physical evidence in the possession of the prosecution pursuant to 42 Pa. C.S.A. § 9543.1, as well as a search of the locations where that evidence had been stored; alternatively, Petitioner seeks documentary evidence that those items have been destroyed.  ECF No. 128 at 4-10.

- A transcription of a recorded statement of trial witness Tamika Brown, in which she purportedly stated that another individual had killed the victim Rashawn Cameron.  Id. at 11.  Petitioner alleges that this recording was played at trial and was entered into evidence.  ECF No. 127 at 1.  (Respondents, in contrast, contended that this recording was played outside of the hearing of the jury only to refresh Brown's recollection, and it was not entered into evidence because it failed to refresh her recollection.  ECF No. 65 at 3.  But this argument by Respondents is contradicted by the trial transcript.  See Trial Tr. of Aug. 16, 2012, at 182-93.  Petitioner further requests that this Court order Respondents to produce the recording for *in camera* review.  ECF No. 127 at 1.)

- A copy of witness James Stewart's sealed sentencing information in United States v. Stewart, No. 11-cr-47 (W.D. Pa.).  Petitioner alleges that Stewart received a sentence of probation despite facing a guideline range of 30-37 months imprisonment.  ECF No. 128 at 12.

---

because the government prosecuted Weekley instead of the person Weekley claims committed his murder.

ECF No. 121 at 11.  In his Traverse, Petitioner concedes that this characterization is more or less accurate, but lacks nuance.  ECF No. 123 at 13-14.  Petitioner also further argues that several "additional grounds" raised in the Amended Petition were not opposed by Respondents.  ECF No. 125.

- Allegedly-newly discovered evidence regarding a deal for leniency for Stewart's testimony at Petitioner's trial. Petitioner alleges that this information was withheld at trial. Id. at 13.

- Permission to interview Alvin "Jay" Flowers, Jr., who currently is held in Beaver County Jail. Id. at 14.

- A list of potential suspects provided by Gregory "Bookie" Williams to Sergeant Steven Roberts of the Aliquippa police department. This list was not produced to Petitioner during discovery in his criminal case, and allegedly does not include Petitioner's name. Petitioner contends that this is exculpatory because Williams testified that, during his own investigation of the murder, "Petitioner's name came up during the conversation in regards to Petitioner and [the victim] having an argument over money." Id. at 23.

- Evidence that the government compensated Stewart, including paying Stewart's telephone bill, which Petitioner alleges was not produced in discovery. Id. at 24.

- The repoll database from the cell cite location data of Petitioner's cellular phone. Id. at 26.

Petitioner also seeks an evidentiary hearing regarding:

- Stewart's federal sentence; newly discovered evidence that Rondell Slappy and Roger McMillen – individuals referenced at trial – did not exist; that another individual named Rodney Slappy was alive and married to Stewart's cousin, Tiffany Hubbard; the of omission Christian Davis' name in handwritten notes next to his phone number in Petitioner's phone records provided by the prosecution prior to trial; a 2015 affidavit of Jamie Butler indicating that Petitioner was not at Stewart's residence on the day of the murder and at least part of the following day; a list of probable suspects prepared by witness Gregory "Bookie" Williams," which allegedly did not include Petitioner's name; and DNA evidence allegedly on Alvin Flowers' clothing, Tamika Brown's car, Cameron's underwear, a slug found at the scene, and various blood sample. Id. at 15-19.

At the requested evidentiary hearing, Petitioner would call certain witnesses to testify.

- Keri Bozich, his private investigator, regarding various issues discussed above. Id. at 19.

- Agent Keven Kauffman of the ATF, regarding Stewart's use as a confidential source and allegedly lying about the existence of Rondell Slappy. Id. at 20.

- Sergeant Steven Roberts, regarding the list of potential suspects provided by Gregory "Bookie" Williams, the chain of custody of evidence, and that the murder weapon was not connected to Petitioner. Id.

- James Christopher Stewart, III, who allegedly would admit to having fabricated the existence of several individuals, as well as Petitioner's alleged confession to the murder. Id. at 20-21.

- Alvin Flowers, Jr., regarding various statements made prior to Petitioner's trial, as well as that he and Cameron did not engage in a sex act, and that Petitioner never was at the scene of the crime. Id. at 21-22.

Further, Petitioner seeks leave to appear at the evidentiary hearing by teleconference. Id. at 25.

Much of Petitioner's requested discovery tracks with several previously filed motions that were denied without prejudice as untimely. ECF Nos. 55, 56, 59, 89, 94, 99, 100, 104, and 119. Respondents responded to some – but not all – of Petitioner's earlier motions, ECF Nos. 65, 92, 93, 103, and 106, and incorporate those arguments into their response to the present discovery motions. ECF No. 130. While those responses will be considered when addressing Petitioner's instant motions, the Court notes that Respondents' prior responses do not address Petitioner's prior Renewed Motion for Post-Conviction DNA Testing, ECF No. 55, Motion to Unseal Witness' Sentence Information, ECF No. 59, or Motion to Produce Material Evidence, ECF No. 104.

Beyond incorporation of their prior briefing, Respondents' opposition to the instant discovery motions primarily consists of the argument that Petitioner is precluded from discovery and an evidentiary hearing by the recent decision of the United States Supreme Court in Shinn v. Ramirez, 142 S. Ct. 1718, 596 U.S. _____ (2022). ECF No. 130 at 9-10.

## IV.    DISCUSSION

### A.    Discovery in Federal Habeas Proceedings

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997); Harris v. Nelson, 394 U.S. 286, 297 (1969) ("broad-ranging preliminary inquiry is neither necessary nor appropriate in the context of a habeas corpus proceeding."). Discovery is authorized in Rule 6(a)

of the Rules Governing Section 2254 Cases in the United States District Court only by leave of court upon a showing by the petitioner of "good cause," which may be made "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief[.]" Harris, 394 U.S. at 300; see also Bracy, 520 U.S. at 908-09; Lee v. Glunt, 667 F.3d 397, 404 (3d Cir. 2012).

"The burden rests upon the petitioner to demonstrate that the sought-after information is pertinent and that there is good cause for its production." Williams v. Beard, 637 F.3d 195, 209 (3d Cir. 2011). "[B]ald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery[.]" Zettlemoyer v. Fulcomer, 923 F.2d 284, 301 (3d Cir. 1991); Mayberry v. Petsock, 821 F.2d 179, 185 (3d Cir. 1987) (same). Additionally, Rule 6 does not authorize what is commonly referred to as "fishing expeditions," and it is not enough for a petitioner to speculate that the discovery he seeks might yield information that would support one of his claims or that it would give support to a new claim. See, e.g., Deputy v. Taylor, 19 F.3d 1485, 1493 (3d Cir. 1994) (quoting with approval Munoz v. Keane, 777 F. Supp. 282, 287 (S.D.N.Y. 1991) ("petitioners are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence")); see also Rega v. Wetzel, No. 13-cv-1781, 2014 WL 4079949, at *2 (W.D. Pa. Aug. 18, 2014); Tedford v. Beard, No. 09-cv-409, 2010 WL 3885207, at *4 (W.D. Pa. Sept. 28, 2010) ("Because a petitioner in a § 2254 case must first exhaust any claim in state court before he brings it in federal court, a federal court must, in considering a state prisoner's motion for discovery, take into account any lack of diligence on the petitioner's part in developing the record in state court.").

Further, where an assessment of a habeas petition reveals that it fails on some legal ground, the proper course is to deny motions seeking factual discovery.  Brown v. DiGuglielmo, No. 07-3465, 2007 WL 4242266, at *1 n.2 (E.D. Pa. Nov. 29, 2007) (citing Williams v. Bagley, 380 F.3d 932, 974-76 (6th Cir. 2004)) (noting that discovery requests relating to procedurally defaulted claims were properly denied because discovery could not lead to a colorable basis for relief on those claims); Peterkin v. Horn, 30 F. Supp. 2d 513, 518-20 (E.D. Pa. 1998) (same).

In the instant case, with respect to Respondents' argument based on Shinn, the United States Supreme Court addressed in that case whether federal habeas courts may consider new evidence not developed in state court when a prisoner relies on Martinez v. Ryan, 566 U.S. 1 (2012), in order to establish cause for procedurally defaulting a claim of ineffective assistance of trial counsel.[6]  Shinn, 142 S. Ct. at 1728.  The Supreme Court held that the equitable rule announced in Martinez does not permit a federal court to dispense with the narrow limits on considering new evidence set forth in 28 U.S.C. § 2254(e)(2).  Id.

28 U.S.C. § 2254(e)(2) recites:

> (2) If the applicant **has failed to develop the factual basis of a claim in State court proceedings**, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

---

[6] The Supreme Court held in Martinez that the negligence of the prisoner's state post-conviction counsel can furnish cause to excuse procedural default of a claim of ineffective assistance of trial counsel if state post-conviction proceedings provide the first opportunity to raise such a claim. 566 U.S. at 17.

> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; **and**
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(emphasis added).

A petitioner is at fault, and thus responsible for failing to develop the record in state court, even if that failure is due to the negligence of his state post-conviction counsel. Shinn, 142 S. Ct. at 1734 (quoting Williams v. Taylor, 529 U.S. 420, 432 (2000)). This is consistent with the general rule that a petitioner bears the responsibility for all state post-conviction attorney errors because there is no constitutional right to counsel in state post-conviction proceedings. Id. at 1735 (citing Coleman v. Thompson, 501 U.S. 722, 754 (1991) and Davila v. Davis, 137 S. Ct. 2058, 2065 (2017)).

Although Martinez recognized an equitable exception to the doctrine of procedural default, the Supreme Court in Shinn concluded that it had no power to redefine when a prisoner "has failed to develop the factual basis of a claim in State court proceedings" under the meaning of the statute. Id. at 1736 (quoting 28 U.S.C. § 2254(e)(2)). Thus, the requirements of Section 2254(e)(2) must be satisfied before a federal court may hold an evidentiary hearing or otherwise consider new evidence on the merits of a defaulted ineffective assistance of trial counsel claim. Id. at 1738.

Additionally, because a hearing on cause and prejudice under Martinez would serve no purpose if the evidence developed therein could not be considered on the merits of the claim, a federal court may not hold an evidentiary hearing or otherwise consider new evidence to assess

cause and prejudice under <u>Martinez</u> unless a petitioner meets the requirements of Section 2254(e)(2). <u>Id.</u> at 1738-39.

In the time since the briefing on the two pending discovery motions closed, the United States Court of Appeals for the Third Circuit issued its decision in <u>Williams v. Superintendent Mahanoy SCI</u>, 45 F.4th 713 (3d Cir. 2022), which further underscores the strict application of Section 2254(e)(2) to new evidence. In <u>Williams</u>, the Third Circuit held that a Petitioner could not develop the facts to support a claim of ineffective assistance of trial counsel in an evidentiary hearing in federal court where his state post-conviction counsel had failed to develop the factual basis for the claim in state court. <u>Id.</u> at 720 (citing <u>Shinn</u>, 142 S. Ct. at 1733). Further, the Third Circuit concluded that, under <u>Shinn</u>, expanding the record through depositions or other discovery under such circumstances was prohibited without satisfying the requirements of Section 2254(e)(2). <u>Id.</u> (citing <u>Shinn</u>, 142 S. Ct. at 1738).

But <u>Shinn</u> and <u>Williams</u> do not prohibit all discovery in a federal habeas case. As has been recognized by at least one other district court within the Third Circuit, "[n]either decision addresses the completely different issue of the extent of a federal court's authority to direct the government to produce <u>Brady</u> evidence when a prisoner has shown good cause for its discovery under Rule 6(a) of the Rules Governing § 2254 Cases." <u>Wholaver v. Wetzel</u>, No. 11-CV-0164, 2022 WL 17082094, at *4 (M.D. Pa. Nov. 18, 2022).

In addition, Section 2254(e)(2) applies only when a petitioner is "at fault" for failing to develop the state court record, which requires a lack of diligence. "If there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." <u>Williams v. Taylor</u>, 529 U.S. at 437 (quoting

28 U.S.C. § 2254(e)(2)).  Diligence for this purpose "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court."  Id. at 435.  If Petitioner shows sufficient diligence in attempting to develop the record in state court as to the discovery requested in this proceeding, then Section 2254(e)(2) imposes no limitation on this Court's ability to review the results of that discovery, or to conduct an evidentiary hearing.

### B. Many of the "Additional Grounds" Asserted in the Amended Petition are Procedurally Defaulted.

In addition to Grounds One through Four, which Respondents concede were exhausted in state court, ECF No. 121 at 5, Petitioner raises several "additional grounds" for relief in the Amended Petition.  ECF No. 85.  As stated above, this Court has construed those "additional grounds" as follows.

(a) The trial court erred in refusing to suppress various evidence. Id. at 17-18, 22-23.

(b) The trial court erred in limiting examination of various witnesses and in allowing or limiting the admission of various evidence during trial.  Id. at 17-19, 25-26.

(c) The trial court erred in refusing to issue certain jury instructions requested by Petitioner.  Id. at 19-20.

(d) Petitioner was held in isolation during pretrial detention, which adversely affected his ability to effectively testify at trial.  Id. at 20.

(e) Petitioner's sentence was improperly calculated.  Id. at 20.

(f) Petitioner's trial and appellate counsel were ineffective for failing to investigate various individuals, some of whom were fabricated by authorities.  Id. at 21.

(g) Petitioner's trial and appellate counsel were ineffective for failing investigate potential exculpatory evidence.  Id.

(h) The trial judge showed animosity toward Petitioner during trial in front of the jury. Id. at 22, 26-28.

(i) The trial court erred when it did not grant a mistrial, and permitted the admission of a search warrant and various inculpatory text messages. Id. at 23-24.

(j) The prosecution committed misconduct by prosecuting Petitioner despite alleged evidence supporting the conclusion that another individual – Alvin "Jay" Flowers – had committed the crime. Id. at 29.

With the possible exceptions of items (e) and (g), it appears that none of Petitioner's so-called "additional grounds" were exhausted in the state courts prior to being raised in this federal habeas proceeding. Additional ground (e) plausibly appears to have been exhausted as Issue II on Petitioner's direct appeal. Super. Ct. Second Direct Appeal Op., 2015 WL 6956530, at * 1. To the extent that additional ground (g) relates to trial counsel, it is duplicative of Grounds One and Two of the Petition. ECF No. 85 at 6, 8, and 21.

A federal court may be precluded from reviewing habeas claims under the "procedural default doctrine." Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman, 501 U.S. at 732; Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) (abrogated on other grounds by Beard v. Kindler, 558 U.S. 53, 60-61 (2009)); Sistrunk v. Vaughn, 96 F.3d 666, 675 (3d Cir. 1996). This doctrine is applicable where, inter alia, a petitioner's claims are "deemed exhausted because of a state procedural bar[.]" Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. Coleman, 501 U.S. at 750. The PCRA's one-year

statute of limitations has been held to be an "independent and adequate" state law ground for denying habeas relief.  Whitney v. Horn, 280 F.3d 240, 251 (3d Cir. 2002).

Here, Petitioner argues that any procedural default should be forgiven.  ECF No. 135 at 2. However, the record does not support excusing the apparent default of additional grounds (a)-(d), (f), and (h)-(j) under either the doctrine of "cause and prejudice" or the doctrine of "fundamental miscarriage of justice."

With respect to "cause and prejudice," the United States Supreme Court has held that where a petitioner has to follow state procedure within the required time period, the "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750; see also Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977) (failure to follow state's procedural rules results in procedural default, which bars federal review of petitioner's claims unless he can show cause and prejudice); Hull v. Freeman, 991 F.2d 86, 90-91 (3d Cir. 1993) (same).  The Supreme Court in Coleman further stated that it recognized "the important interest in finality served by state procedural rules and the significant harm to the States that results from the failure of federal courts to respect them."  501 U.S. at 750.

The Supreme Court has defined "cause" as "some objective factor external to the defense."  Murray v. Carrier, 477 U.S. 478, 488 (1986).  "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or . . . some interference by officials" are two examples, but not an exhaustive list.  Id.

In order to show a fundamental miscarriage of justice, the Supreme Court requires a petitioner to demonstrate that "a constitutional violation has probably resulted in the conviction

of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 321 (1995) (quoting Murray, 477 U.S. at 496). Under this standard, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Id. at 324. Once such evidence is presented, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id. at 327. Petitioner has adduced no new evidence of his actual innocence, nor do his arguments lead to the conclusion that "it is more likely than not that no reasonable juror" would have convicted him.

The one-year period under Pennsylvania's PCRA has passed. Indeed, the Pennsylvania Supreme Court denied *allocatur* in Petitioner's second PCRA proceedings on February 22, 2021. Com. v. Weekley, 249 A.3d 495 (Pa. 2021) (Table). Any additional ground that was not already presented to the state court, and which does not fall into one of the narrow exceptions to the one-year deadline for filing, is procedurally defaulted. 42 Pa. C.S.A. § 9545(b). Because none of additional grounds (a)-(d), (f), and (h)-(j) satisfies either requirement, they are procedurally defaulted.

Additionally, nothing in the record presented would allow this Court to excuse the default. Petitioner presents no evidence on the record from which this Court could conclude that procedural default of the additional grounds (a)-(d), (f), and (h)-(j) should be excused under either cause and prejudice or actual innocence. Moreover, as described below, this Court is precluded from considering any new evidence to support either such argument unless Petitioner was not at fault for failing to develop the claim before the state court, or he meets the requirements of 28 U.S.C. § 2254(e)(2). Shinn, 142 S. Ct. at 1788-39. See also Williams v. Sup't Mahanoy SCI, 45 F.4th at 720.

But Petitioner's additional grounds (a)-(d), (f), and (h)-(j) are not based on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2254(e)(2)(A)(i). Nor is any of the requested evidence based on "a factual predicate that could not have been previously discovered through the exercise of due diligence." Id. § 2254(e)(2)(A)(ii). Furthermore, in spite of Petitioner's attempt to blame his post-conviction counsel for failing to develop the factual basis for his additional grounds, ECF No. 135 at 3, he ultimately is responsible for her failure to do so. Shinn, 142 S. Ct. at 1734 (quoting Williams v. Taylor, 529 U.S. at 432). Accordingly, because Petitioner is at fault for failing to develop the state court record, and Petitioner does not meet the requirements of Section 2254(e)(2), this Court may not consider whatever new evidence Petitioner believes will be uncovered as a result of his discovery motion to support either the merits of his claims, or to overcome his procedural default of additional grounds (a)-(d), (f), and (h)-(j). Id. at 1738-39; Williams v. Sup't Mahanoy SCI, 45 F.4th at 720.

### C. Petitioner has not Demonstrated Good Cause for DNA Testing.

Petitioner seeks an order requiring DNA testing of the following evidence.

a) Swabs of blood taken from Tamika Brown's vehicle from a search with luminol spray.

b) Clothing belonging to Alvin Flowers Jr. recovered from Ambridge Towers garbage bin by Beaver County detectives. The clothes were worn by Flowers while he showered, but DNA expert Ashlee Mangan testified that the clothes may still contain evidence from the crime.

c) Saliva from the Boxer Shorts of victim Rashawn Cameron worn when he met his demise.

d) Blood from mail found on the living room coffee table at the crime scene.

e) Mutilated Slug found in the living room diagrammed in Defense Trial Exhibit BB.

ECF No. 128 at 4. While Petitioner cites to 42 Pa. C.S.A. § 9543.1 as the legal basis for the requested DNA tests, this Court's authority to allow discovery in a federal habeas case does not arise from a state statute, but from Rule 6 of the Rules Governing Section 2254 cases, as set forth above.

Petitioner did not seek DNA testing of any of this evidence as part of his second PCRA proceedings. This deficiency was featured prominently in the Second PCRA Trial Court's opinion. Second PCRA Trial Ct. Op., ECF No. 41-26 at 18-19 (Flowers' clothing tested negative for blood as part of the PCRA proceedings; Petitioner never requested further testing or DNA testing). See id. at 19 (Petitioner never sought to have second bullet, other blood, and other evidence tested, despite knowing it existed). See also id. at 22-23 (neither Petitioner nor prosecution sought to have swabs tested).

After the Superior Court affirmed the denial of his second PCRA petition – and after filing the instant federal habeas petition – Petitioner sought DNA testing of the above items in state court under the same Pennsylvania statute that he asserts here. See Post-Conviction DNA Testing Mot., dated Sept. 14, 2021, at 2. After the issue was briefed, the trial court determined that it had jurisdiction to adjudicate the motion, but that Petitioner did not meet the requirements for DNA testing under the statute. See generally Mem. Op. and Rule 907 Notice, dated Dec. 10, 2011. The state court recognized that each item of evidence that Petitioner sought to have tested by way of that motion – and which Petitioner seeks to have tested here – was discovered prior to his conviction. Id. at 6. Additionally, the trial court held that Petitioner had failed to show that DNA testing – if conducted – would return exculpatory results that would establish his actual innocence. The trial court found as follows.

- Even if blood swabs returned the victim's DNA from Tamika Brown's car, that would be consistent with the testimony of George Williams at trial that the victim had been at Tamika Browns home only a few days prior to his murder. Id. at 9.

- The clothing of Alvin Flowers already tested negative for biological material. Additionally, the clothing that Petitioner sought to be tested had been worn inside a coat that also had been tested, and was unlikely to have exculpatory DNA evidence.[7] Id.

- The victim's underwear already had tested negative for Petitioner's DNA, and the jury was informed of this at trial. If the DNA of Alvin Flowers were found on it pursuant to further testing, that would be consistent with the prosecution's theory that Flowers was performing a sex act on the victim just prior to the murder. Id. at 10.

- If DNA from another individual was found in the blood evidence from the victim's mail, it would not establish that Petitioner was innocent; merely that another person had been in the apartment, as the jury already had been told. Id.

- The slug that Petitioner seeks to have tested was not the one that killed the victim. If the slug had DNA from another individual, that would show that another individual was in the apartment, not that Petitioner did not kill the victim. Id. at 11.

The trial court instead relied on Petitioner's "statement to Mr. Stewart that he killed the [v]ictim, combined with the forensic match of the bullet found at the crime scene to [Petitioner's] Redhawk revolver" as "ample evidence for a reasonable jury to find that [Petitioner] was guilty of the murder." Id. at 9.

Of particular significance, the Court finds that the record does not indicate that Petitioner appealed from the trial court's order denying DNA testing.

---

[7] While Petitioner argues that testimony by Ashlee Mangan – a forensics expert who had testified at trial and at Petitioner's second PCRA proceedings – indicates that DNA evidence might exist, it is noteworthy that the testing of Flower's clothing for biological material took place after Ms. Mangan's testimony as part of Petitioner's second PCRA proceedings. Compare PCRA Hr'g Tr. dated June 8, 2018 at 73-95 (Mangan testimony) and id. at 169 and 173 (continuing the hearing to test evidence) with PCRA Hr'g Tr. dated Aug. 1, 2018 at 7-11 (testing of conducted in front of counsel on July 31, 2018) and id. at 20-27 (no blood or suspected blood found on clothes).

It is true that the "good cause" standard of Rule 6 of the Rules Governing Section 2254 Cases differs from the "actual innocence" standard applied by the state court under Section 9543.1. But as a practical matter, the results here are the same.

First, none of the evidence that Petitioner seeks to have tested is new. <u>See</u> Mem. Op. and Rule 907 Notice, dated Dec. 10, 2011, at 6. All of it was known to Petitioner prior to his conviction. ECF No. 41-26 at 11. <u>See also</u> Second PCRA Super. Ct. Op., 2020 WL 5015898, at *5. And as the trial court recognized, Petitioner never sought to have it tested for DNA as part of his second PCRA proceedings. Petitioner was not diligent in presenting this evidence to the state court. Petitioner is responsible for this lack of diligence. <u>Shinn</u>, 142 S. Ct. at 1734. Petitioner further does not assert a new rule of constitutional law applies to this evidence. Thus, Petitioner cannot meet the requirements of Section 2254(e)(2) to support DNA testing.

Moreover, any claim based on the underwear, blood evidence from the victim's mail, or the slug that did not kill the victim is procedurally defaulted. Mem. Op. and Rule 907 Notice, dated Dec. 10, 2011, at 6; Trial Tr. dated Aug. 13, 2012, at 122-23 (discussing absence of Petitioner's DNA on victim's boxer shorts); Trial Tr. dated Aug. 10, 2012, at 126-29 and 216-17 (discussing blood on mail); Trial Tr. dated Aug. 16, 2012, at 264-68 (discussing the slug).

Further, with respect to the blood swabs and clothing, Petitioner has not shown that DNA testing would show entitlement to relief. <u>Harris</u>, 394 U.S. at 300. As the state court recognized, even if the tests of the blood swabs returned the victim's DNA, those results would be consistent with testimony placing the victim at Tamika Brown's house shortly before the murder. Trial Tr. dated Aug 9, 2012, at 210-11. Additionally, the evidence of record does not indicate the presence of biological material on Flowers' clothing – which is consistent with the theory that he immediately showered in that clothing after the murder. Furthermore, even if the victim's DNA

31

were present on the clothing, that would be consistent with the theory that Flowers was at least present in the victim's home immediately prior to the murder, consistent with the prosecution's theory.

Therefore, Petitioner has failed to meet the good cause standard for this requested DNA testing. Accordingly, his motion will be denied in this respect.

**D.   Respondents must Provide a Transcription of the Recorded Statement of Tamika Brown or Explain its Absence.**

Petitioner also seeks the transcription of a tape-recorded statement by Tamika Brown in which she allegedly stated that she believed that Alvin "Jay" Flowers had killed the victim Rashawn Cameron.  ECF No. 128 at 11.  The recorded statement was played at trial and admitted into evidence.   Trial Tr. dated Aug. 16, 2012, at 183-93.   Petitioner also moves for the undersigned to review the tape *in camera*, which he believes would support his motion for transcription.  ECF No. 127 at 1.  A copy of the tape was not included with the state court records provided by Respondents in response to the Service Order.  ECF No. 11.

Respondents contend that this recording was played outside of the hearing of the jury only to refresh Ms. Brown's recollection at trial, and was not entered into evidence because it failed to refresh her recollection.  ECF No. 65 at 3.  But, as stated above, Respondents' assertion is clearly contradicted by the state court record.  Trial Tr. dated Aug. 16, 2012, at 183-93.

Tamika Brown's recorded statement does not provide the basis of any of Petitioner's grounds for relief that were exhausted in state court.  There can be no plausible argument that Ms. Brown's recorded statement was newly discovered, and the Pennsylvania PCRA's strict one-year deadline already has passed.  Any claim arising therefrom would be procedurally defaulted. Petitioner further has not demonstrated any diligence in seeking this information during his PCRA proceedings.  Accordingly, he has failed to demonstrate good cause.

That said, Ms. Brown's statement is part of the state court record which this Court ordered to be produced by Respondents.  ECF No. 11; ECF No. 96.  The recorded statement was played at trial in the presence of the jury.  Trial Tr. dated Aug. 16, 2012, at 183-93.  Accordingly, Respondents will be required to produce a transcription of the taped statement, or to state the reasons why they cannot do so.

### E.    Petitioner has not Demonstrated Good Cause for his Discovery Requests with Respect to James Stewart.

Petitioner seeks the following discovery related to James Stewart – a witness whose testimony at trial tied Petitioner to the .44 magnum pistol used to murder Rashawn Cameron, and who testified that Petitioner confessed the murder to him.

- A copy of witness James Stewart's sealed sentencing information in United States v. Stewart, No. 11-cr-47 (W.D. Pa.).  Petitioner alleges that Stewart received a sentence of probation despite facing a guideline range of 30-37 months imprisonment.  ECF No. 128 at 12.

- Newly discovered evidence regarding a deal for leniency for Stewart's testimony at Petitioner's trial.  Petitioner alleges that this information was withheld at trial. Id. at 13.

- Evidence that the government compensated Stewart, including paying Stewart's telephone bill, which Petitioner alleges was not produced in discovery.  Id. at 24.

But the requested information does not relate to an exhausted claim.  See Com. v. Weekley, 2020 WL 5015898, at *6 (exhausted grounds with respect to Stewart limited to telephone records indicating that Petitioner called Stewart's landline from his cellular phone on November 21, 2010.  See also Petitioner's Amended PCRA Br. filed Oct. 15, 2018, ECF No. 41-24 at 8-10 (showing same).

Neither is any of this requested information newly discovered.  Stewart's plea agreement in United States v. Stewart, No. 11-cr-47 (W.D. Pa.), was discussed at trial, and Petitioner's counsel referenced it thoroughly to impeach Stewart on the stand.  Trial Tr. dated Aug. 9, 2012,

at 71-99.  Petitioner's counsel presented it to Stewart in front of the jury, and made him read parts of the agreement into the record.  Id. at 89 and 91-92.  He did so after Stewart had stated that he had "no agreement" with the federal government, Trial Tr. dated Aug. 8, 2012, at 200, maximizing the plea agreement's value as impeachment of Stewart's veracity.

Furthermore, Agent Kauffman of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") conceded in his testimony that cooperation provided by Stewart would be considered by the United States Attorney and a federal court when resolving Stewart's federal charges, while accurately stating that ultimately a judge would decide Stewart's federal sentence regardless of his cooperation or lack thereof.  Trial Tr. dated Aug. 14, 2012, at 10-13, 20.  Additionally, Stewart testified at trial that the federal government had paid his phone bill.  Trial Tr. dated Aug. 8, 2012, at 191.

Moreover, Stewart's judgment sentence was entered in 2013 – more than five years before Petitioner's PCRA hearings took place – in a case of which Petitioner had actual knowledge.  Petitioner was aware of Stewart's plea, and aware of his case number at least from the record at trial.  While Petitioner is correct that Stewart's motion for a downward departure is sealed, Stewart, No. 11-cr-47, ECF Nos. 63, 64, and 66, preliminary findings as to Stewart's guideline range are on the public record.  Stewart, No. 11-cr-47, ECF No. 65 at 2  Stewart's sentence of probation was entered on the public docket on April 5, 2013.  Stewart, No. 11-cr-47, ECF No. 68 at 1.

Any claim related to Stewart's plea agreement is procedurally defaulted.  Petitioner is at fault for failing to develop the record in state court, and it is clear from the record that he cannot meet the requirements of Section 2254(e)(2).  As such, Petitioner has failed to show good cause

for discovery with respect to this evidence, and the motion will be denied with respect to the same.

**F.    Petitioner has not Demonstrated Good Cause for Permission to Interview Alvin Flowers.**

Petitioner seeks permission to interview Alvin "Jay" Flowers, Jr., who currently is held in Beaver County Jail.  ECF No. 128 at 14.  Flowers allegedly was performing a sex act on the victim at the time of the murder, and initially was a suspect.  Flowers asserted his Fifth Amendment right against self-incrimination at Petitioner's trial.  See Suppression Hr'g Tr. dated Aug. 14, 2012, at 98-103, ECF No. 108 at 611-16.  Petitioner believes that Flowers now will testify that, among other things, he did not engage in a sex act with the victim, and that Petitioner never had been to the scene of the crime.  ECF No. 128 at 21-22.

This claim is procedurally defaulted.  Petitioner also presents no evidence of what Flowers actually would say.  His motion is speculative, and thus does not meet the good cause standard required by Rule 6.  See, e.g., Deputy, 19 F.3d at 1493 (quoting with approval Munoz, 777 F. Supp. at 287) ("petitioners are not entitled to go on a fishing expedition through the government's files in hopes of finding some damaging evidence").  Petitioner's motion will be denied as to this requested discovery.

**G.    Petitioner has not Demonstrated Good Cause for Discovery from Gregory "Bookie" Williams.**

Petitioner seeks discovery of a list of potential "persons of interest" that was provided to police on November 22, 2010, by Gregory "Bookie" Williams – an uncle of the victim.  ECF No. 128 at 23; ECF No. 128-3 at 89.  Petitioner alleges that the list was not produced through discovery at his criminal trial.  ECF No. 128 at 23.  Petitioner speculates that the list would not

have Petitioner's name on it.  Id. at 18.  He believes that this would be exculpatory because Williams performed his own investigation.  Id.

At trial, Williams testified that on November 22, 2010 – the day after the murder, and sometime after he had learned that his nephew had been killed – he sought out Flowers because he had heard that Flowers and Cameron had been together the prior night.  When Williams located Flowers, Flowers stated that he had nothing to do with the murder, and gave Cameron's gun to Williams, which Flowers had taken from Cameron and hidden in a grill.  Trial Tr. dated Aug. 9, 2012, at 206-207 and 212.  Williams testified that he took the gun to his mother's house, called Aliquippa police, and turned over the gun to a police officer.  Id. at 207-208.

On cross-examination, defense counsel characterized Williams as having "conducted a little investigation of [his] own," which Williams did not refute on the stand.  Id. at 216.  When asked whether his investigation ever had indicated that Petitioner was at the scene of the murder, Williams responded, "Well, I can't say that it put him at the scene.  The only thing, his name came up during the conversation in regards to him and [Cameron] having an argument over $400."  Id. at 216-17.  Williams stated that he did not know when that argument had occurred. Id. at 217.

A police report written by Sergeant Roberts provided by Petitioner indicates that Williams brought a written list of "persons that he thought should be of interest [sic]" to police on November 22 – the day after the murder.  ECF No. 128-3 at 89.  The report does not indicate the contents of the list, or whether it was retained by the police, or merely shown to them by Williams.  Petitioner does not assert – and the record does not indicate – that the police report was withheld during discovery.  Id.  See also ECF No. 99-6 at 1-2 ("Homicide Discovery List"

dated December 19, 2011, referencing "Aliquippa Police Report 10-00987." This is the same number on the report referencing Williams' list. ECF No. 128-3 at 89.).

This list is not related to any ground for relief that was exhausted before the state courts. Further, the existence of the list is not new – it was known to Petitioner prior to his conviction. Any claim based on this list would be procedurally defaulted. Further, Petitioner has not met his burden under Section 2254(e)(2), or otherwise to show good cause under Rule 6. Petitioner's motion will be denied with respect to this list.

### H.   Petitioner has not Demonstrated Good Cause with Respect to the Requested Cell Site Location Data.

Petitioner also seeks discovery of the "repoll database" from his cell phone records. ECF No. 128 at 26. Without elaboration, Petitioner states that the "repoll database" was withheld, and would be exculpatory.

At the outset, Petitioner is unclear as to what information, specifically, is missing from his phone records. For example, Petitioner's phone records that were presented at trial included the repoll numbers from his cellular telephone calls between November 20, 2010 at 7:59 p.m, and November 21, 2010, at 1:38 p.m. See Second PCRA Trial Ct. Op., ECF No. 41-28 at 48 n.16, and 75-81. See also Trial Tr. dated Aug. 15, 2012, at 196. As such, it appears that the repoll data were known to him prior to his conviction.

Additionally, Petitioner does not indicate how any of the purportedly missing data relate to an exhausted claim, or how their absence could not have been discovered earlier with due diligence, or that he was diligent in attempting to present them to the state court, or that they are newly discovered. Petitioner has not met his burden under Section 2254(e)(2), or otherwise to show good cause for discovery. Accordingly, his motion for discovery with respect to these data is denied.

I.     **Petitioner has not Met his Burden to Show Entitlement to an Evidentiary Hearing.**

Petitioner also seeks an evidentiary hearing regarding the following.

- Stewart's federal sentence; newly discovered evidence that Rondell Slappy and Roger McMillen – individuals referenced at trial – did not exist; that another individual named Rodney Slappy was alive and married to Stewart's cousin, Tiffany Hubbard; the omission Christian Davis' name in handwritten notes next to his phone number in Petitioner's phone records provided by the prosecution prior to trial; a 2015 affidavit of Jamie Butler indicating that Petitioner was not at Stewart's residence on the day of the murder and at least part of the following day; a list of probable suspects prepared by witness Gregory "Bookie" Williams," which allegedly did not include Petitioner's name; and DNA evidence allegedly on Alvin Flowers' clothing, Tamika Brown's car, Cameron's underwear, a slug found at the scene, and various blood sample.. ECF No 128 at 15-19.

Petitioner asserts that at an evidentiary hearing, he would call certain individuals to testify.

- Keri Bozich, his private investigator, regarding various issues discussed above. Id. at 19.

- Agent Keven Kauffman of the ATF, regarding Stewart's use as a confidential source and allegedly lying about the existence of Rondell Slappy. Id. at 20.

- Sergeant Steven Roberts, regarding the list of potential suspects provided by Gregory "Bookie" Williams, the chain of custody of evidence, and that the murder weapon was not connected to Petitioner. Id.

- James Christopher Stewart, III, who allegedly would admit to having fabricated the existence of several individuals, as well as Petitioner's alleged confession to the murder. Id. at 20-21; and

- Alvin Flowers, Jr., regarding various statement made up to and including Petitioner's trial, as well as that he and Cameron did not engage in a sex act, and that Petitioner never was at the scene of the crime. Id. at 21-22.

Under the Anti-terrorism and Effective Death Penalty Act (the "AEDPA"), "a habeas court is barred [under Section 2254(e)(2)] from holding an evidentiary hearing" generally. Palmer v. Hendricks, 592 F.3d 386, 392 (3d Cir. 2010) (citing Williams v. Taylor, 529 U.S. at 430, and Wilson v. Beard, 426 F.3d 653, 665 (3d Cir. 2005)). See also Cullen, 563 U.S. at 181-

82.   "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." Palmer, 592 F.3d at 393 (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).  Accord Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000) ("AEDPA, unlike [Townsend v. Sain, 372 U.S. 293 (1963)] and [Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992)], does not require that such a hearing be held.  Instead, federal courts have discretion to grant a hearing or not.").  In deciding whether to exercise that discretion, the district court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief" under AEDPA's standards of review.  Schriro, 550 U.S. at 474 (citation omitted); Palmer, 592 F.3d at 393 (quoting Campbell v. Burris, 515 F.3d 172, 184 (3d Cir. 2008) ("bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing.")).

Petitioner has not met his burden to show that under AEDPA, this Court is permitted to hold an evidentiary hearing with respect to the bases that he seeks to raise.  The reasons that Petitioner has not met his burden under Section 2254(e)(2) with respect to Stewart's federal sentence; the list of probable suspects prepared by a trial witness Gregory "Bookie" Williams," and the requested DNA testing of various evidence are addressed above, and will not be repeated here.  The same logic applies to the remaining evidence – Petitioner does not show any of the issues that he wishes to raise at an evidentiary hearing could not have been developed at the state court with the exercise of due diligence.

Indeed, the issue of Rondell or Rodney Slappy was well known at trial.[8]  See Trial Tr.

dated Aug. 14, 2012, at 25 ("Stewart also said on the ride back that he was aware that Weekley

shot and killed another gentleman by the name of Slappy, and it turns out, and I will produce

information at a later point in time to say that this gentleman that he claimed to have knowledge

that [Petitioner] killed, he is still alive.").  Petitioner does not explain how Slappy's existence

could not have been exhausted before the state courts through the exercise of due diligence, nor

does he provide any basis to excuse default, or to satisfy Section 2254(e)(2).

Next, Petitioner concedes that Christian Davis' telephone number was on the telephone

records that were provided to him.  See ECF No. 99 at 3; ECF No. 99-1 at 2-3.  The records were

from Petitioner's own cellular phone, and Christian Davis purportedly was the roommate of

Anthony Gaskins, Petitioner's alibi witness at trial.   See ECF No. 99 at 3-4; ECF No. 99-3 at 2

(discussing that Petitioner was "always" at Gaskin's house).  But Petitioner does not explain how

he either did not know the identity of the phone number in his own records without, and could

not determine it on his own with due diligence in order to present this issue of Davis' name not

having been handwritten on the records to the state court.  Nor does he provide any basis to

excuse default, or to satisfy Section 2254(e)(2).

Petitioner further does not explain his purportedly "new" evidence that Roger McMillen

– the individual who purportedly informed Stewart that Cameron had been killed, Trial Tr. dated

Aug. 8, 2012, at 210-11 – does not exist, or why evidence of the same could not be developed at

---

[8] Based on the record, it is unclear whether "Rodney Slappy" and "Rondell Slappy" ever were described as different individuals, or if police simply misheard and spelled the name differently in their reports.  Compare ECF No. 128-3 at 84 (interview of Stewart by Aliquippa police dated February 11, 2011 mentioning "Rondel Slappy" and that ATF agents were present) with id. at 52 (ATF report of interview with Stewart, also dated February 11, 2011, mentioning "Rodney Slappy.").

the state court through due diligence.  He also does not explain how such information would meet Section 2254(e)(2).

As to the affidavit of Jamie Butler, ECF No. 128-3 at 92, it is dated November 23, 2015 – roughly three years prior to his PCRA hearings.  He asserts that he directed counsel to submit it as a basis for relief, ECF No. 99-4 at 2, but the record does not indicate that it ever was.  But Petitioner bears the fault for counsel's negligence in failing to develop the record at the PCRA proceedings.  Shinn, 142 S. Ct. at 1728 (quoting Williams v/ Taylor, 529 U.S. at 432).

Finally, even assuming that AEDPA did not bar the Court from holding an evidentiary hearing, Petitioner has not carried his burden to persuade this Court to exercise its discretion to do so on these bases.  This is because he has failed to tie his desire for an evidentiary hearing to Grounds One to Four of the Petition – which are the only grounds for relief that have been exhausted in state court.  Moreover, Petitioner has not provided any evidence that Roberts, Stewart or Flowers will testify as Petitioner speculates that they will.[9]  Trial Tr. dated Aug. 16, 2012, at 218 (Roberts testimony linking murder weapon to Petitioner).

Accordingly, an evidentiary hearing will be denied.  Further, Petitioner's request to appear at such a hearing will be denied as moot.

---

[9] Kauffman's testimony at trial at least implies that he believed that Stewart untruthful in his statement to police Petitioner had murdered Slappy.  Trial Tr. dated Aug. 14, 2012, at 17-18 ("Q: And did Mr. Stewart eventually come clean with you?  A: Oh, I was present when he did come clean[.]"); Id. at 26 ("Q: And of course, as with the other information, [Stewart] claimed to have no personal knowledge [about Slappy]?  A: That's correct.").  But, to the extent that it is relevant to any of the claims that are properly before this Court, this testimony already is of record. Petitioner has not presented any reason to have an evidentiary hearing so that Kauffman can repeat it.

## V.     CONCLUSION

For the reasons set forth herein, Petitioner's pending discovery motions, ECF Nos. 127 and 128, will be denied.  Respondents shall produce a transcript of Tamika Brown's recorded statement, or explain with particularity why they cannot, on or before May 1, 2023.

An appropriate Order follows.

AND NOW, this 31st day March, 2023, IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1.   Petitioner's Question for the Court, ECF No. 127, is construed as a motion for discovery, and DENIED.

2.   Petitioner's Comprehensive Motion for Discovery, ECF No. 128 is DENIED.

3.   Petitioner's request to appear at an evidentiary hearing via video conference is DENIED as MOOT.

4.   On or before May 1, 2023, and pursuant to the Service Order dated July 21, 2021, ECF No. 11, Respondents shall file on the docket and produce to Petitioner a transcription of the audio taped statement of Tamika Brown that was played at trial, or file a notice explaining with particularity why it could not be transcribed.  If Respondents are unable to locate the tape, they must state with particularity the steps that they took to locate it, and attach a sworn affidavit relative to those efforts.

IT IS FURTHER ORDERED that, in accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Rule 72.C.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of this Order to file an appeal to the District Judge which includes the basis for objection to this Order.  Any party opposing such an appeal may respond within fourteen (14) days thereafter.  Any appeal is to be submitted to the Clerk of Court, United States

District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.  Failure to file a timely appeal will constitute a waiver of any appellate rights.

Dated: March 31, 2023                                   BY THE COURT:

                                                        MAUREEN P. KELLY
                                                        UNITED STATES MAGISTRATE JUDGE

cc:     Monroe Weekley, III
        KS9184
        SCI Albion
        10745 Route 18
        Albion, PA 16475

        All counsel of record (*via* CM/ECF)